**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHEVRON CORP.,

                Plaintiffs,

     -against-

                                    Case No. 1:12-mc-65 GLS/CFH

                                    Hon. Gary L. Sharpe

STEVEN DONZIGER, *et al.*,

                Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF NON-PARTY JOHN DOE MOVANTS TO QUASH SUBPOENAS TO MICROSOFT, INC. SEEKING IDENTITY AND EMAIL USAGE INFORMATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO QUASH**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    STATEMENT OF FACTS ................................................................................... 1

     A.    Chevron's 18, 2012 Subpoenas to Microsoft, Yahoo!, and Google ..................... 2

     B.    The Non-Party John Doe Movants ........................................................ 3

     C.    The Nature of the Information Sought by Chevron ............................................. 4

III.   LEGAL STANDARD ......................................................................................... 6

IV.    ARGUMENT ...................................................................................................... 7

     A.    The Subpoena Violates the Does' Constitutional Rights Under the First
          Amendment. ........................................................................................ 7

          1.    The Subpoena Violates the Does' First Amendment Right to Anonymous
               Speech. ..................................................................................... 8

               a.    The Right to Engage in Anonymous Speech is Protected By the
                    First   Amendment. ....................................................... 8

               b.    Anonymous Speakers Enjoy a Qualified Privilege Under the First
                    Amendment. ....................................................................... 9

               c.    As Chevron's Subpoena Demand for Identity Information Cannot
                    Survive the Scrutiny Required By the First Amendment, It Must
                    Be Quashed Under Federal Rule of Civil Procedure 45. .............. 11

                   i.    Chevron Did Not Issue This Subpoena in Good Faith or for
                          Any Proper Purpose. ...................................................... 12

                   ii.   Chevron Has Made No Showing that the Information
                        Sought Relates to a Core Claim or that it is Directly and
                        Materially Relevant to that Claim or Defense. ................. 12

                   iii.  Chevron Has Made No Showing that the Information
                        Sought Is Unavailable from Any Other Source. ............... 13

2.      The Subpoena Violates the Does' First Amendment Right to
        Association............................................................................................ 14

        a.      The Does Enjoy a First Amendment Right to Political Association
                and to Advocate Controversial Views as a Group. ...................... 14

        b.      The Does Have a Qualified First Amendment Privilege Subject To
                Heightened Scrutiny That Can Only Be Overcome By a
                Compelling Interest.................................................................... 16

                i.  The Does' Right to Association Will be Harmed if Their
                    Identities and Email Usage Information is Disclosed ...... 17

                ii. Disclosure of the Does' Information Does Not Serve a
                    Compelling Interest and Is Not the Least Restrictive Means
                    of Furthering a Compelling Interest.................................. 17

        B.      The Subpoena Is Facially Overly Broad and Should be Quashed in Its
                Entirety.................................................................................................. 19

V.      CONCLUSION............................................................................................ 20

# TABLE OF AUTHORITIES

## CASES

*Bada Co. v. Montgomery Ward & Co.*,
   32 F.R.D. 208 (S.D. Cal. 1963) .................................................................................. 13

*Bates v. City of Little Rock*,
   361 U.S. 516 (1960) ....................................................................................... 14, 17

*Buckley v. Am. Constitutional Law Found.*,
   525 U.S. 182 (1999) ................................................................................... *passim*

*Carvel Corp. v. Lefkowitz*,
   431 N.Y.S.2d 609 (N.Y. Sup. Ct. 1979) ........................................................... 7

*Church of the Am. Knights of the KKK v. Kerik*,
   356 F.3d 197 (2d Cir. 2004) ............................................................................ 7

*Columbia Ins. Co. v. Seescandy.com*,
   185 F.R.D. 573 (N.D. Cal. 1999) .................................................................. 10

*Dendrite Int'l v. Doe No. 3*,
   775 A.2d 756 (N.J. App. 2001) ..................................................................... 10

*Doe v. 2theMart.com*,
   140 F. Supp. 2d 1088 (W.D. Wash. 2001) ............................................ *passim*

*Doe v. Cahill*,
   884 A.2d 451 (Del. 2005) .............................................................................. 10

*Enterline v. Pocono Medical Center*,
   751 F. Supp. 2d 782 (M.D. Pa. 2008) .......................................................... 11

*FEC v. LaRouche Campaign, Inc.*,
   817 F.2d 233 (2d Cir. 1987) .......................................................................... 16

*Fed. Election Comm'n v. Larouche Campaign*,
   817 F.2d 233 (2d Cir. 1987) ............................................................................ 6

*Gibson v. Florida Legislative Investigation Comm.*,
   372 U.S. 539 (1963) ...................................................................................... 15

*Grandbouche v. Clancy*,
   825 F.2d 1463 (10th Cir. 1987) .................................................................... 10

*In re Grand Jury Proceedings,*
  776 F.2d 1099 (2d Cir. 1985)............................................................................. 16, 17, 18

*In re Motor Fuel Temperature Sales Practices Litig.,*
  641 F.3d 470 (10th Cir. 2011) ................................................................................... 16

*Int'l Longshoremen's Assoc. v. Waterfront Comm'n,*
  667 F.2d 267 (2d Cir.1981)................................................................................... 17, 18

*Knox v. SEIU, Local 1000,*
  132 S. Ct. 2277 (2012) ............................................................................................. 16

*Local 1814, Int'l Longshoremen's Assoc. AFL-CIO v. Waterfront Comm'n. of New York Harbor,*
  667 F.2d 267 (2d Cir. 1981)...................................................................................... 16

*Mattel, Inc. v. Walking Mountain Productions,*
  353 F.3d 792 (9th Cir. 2003) ..................................................................................... 7

*McIntyre v. Ohio Elections Comm'n,*
  514 U.S. 334 (1995)................................................................................................. 8

*McMann v. SEC,*
  87 F.2d 377 (2d Cir. 1937)....................................................................................... 19

*Meyer v. Grant,*
  486 U.S. 414 (1988)................................................................................................. 7

*Mobilisa, Inc. v. Doe,*
  170 P.3d 712 (Ariz. App. 2007)................................................................................ 11

*N.Y. State National Organization for Women v. Terry,*
  886 F.2d 1339 (2d Cir. 1989).................................................................................... 16

*NAACP v. Button,*
  371 U.S. 415 (1963)................................................................................................ 15

*NAACP v. State of Alabama ex rel. Patterson,*
  357 U.S. 449 (1958)........................................................................................ 14, 15, 16

*New York Times v. Sullivan,*
  376 U.S. 254 (1964)................................................................................................. 9

*Perry v. Schwarzenegger,*
  591 F.3d 1126 (9th Cir. 2010) ........................................................................... 7, 16, 18

*Reno v. ACLU*,
    521 U.S. 844 (1997) ........................................................................ 8

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) ...................................................................... 16

*Shelley v. Kraemer*,
    334 U.S. 1 (1948) ........................................................................... 9

*Shelton v. Tucker*,
    364 U.S. 479 (1960) ...................................................................... 14

*Sherwin-Williams Co. v. Spitzer*,
    61 ERC (BNA) 1182 (N.D.N.Y. 2005) ........................................ 16

*Silkwood v. Kerr-McGee Corp.*,
    563 F.2d 433 (10th Cir. 1977) ..................................................... 10

*Sony Music Entm't Inc. v. Does 1-40*,
    326 F. Supp. 2d 556 (S.D.N.Y. 2004) ......................................... 10

*Talley v. California*,
    362 U.S. 60 (1960) .......................................................................... 8

*Thomas v. Collins*,
    323 U.S. 516 (1945) ...................................................................... 15

*United States ex rel. Sasaki v. N.Y. Univ. Med. Ctr.*,
    2011 U.S. Dist. LEXIS 95059 (S.D.N.Y. Aug. 23, 2011) ............ 20

*United States v. IBM*,
    83 F.R.D. 97 (S.D.N.Y. 1979) ..................................................... 19

*United States v. Jones*,
    132 S. Ct. 945 (2012) .................................................................... 15

*United States v. Maynard*,
    615 F.3d 544 (D.C. Cir. 2010),
    *aff'd sub nom. Jones*, 132 S. Ct. 945 ......................................... 15

*USA Technologies, Inc. v. Doe*,
    713 F. Supp. 2d 901 (N.D. Cal. 2010) ......................................... 11

## STATUTES

N.Y. C.P.L.R. § 2304 ............................................................................................... 7

N.Y. C.P.L.R. § 3103 ............................................................................................... 7

## RULES

Federal Rule of Civil Procedure 26 ...................................................................... 6, 19

Federal Rule of Civil Procedure 45 ................................................................... 1, 7, 11

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ........................................................................................... *passim*

## OTHER AUTHORITIES

David R. Baker, *Chevron seeks e-mail logs in Ecuador suit*, S.F. CHRONICLE
    (Oct. 1, 2012) ................................................................................................. 9, 19

Barbara Leonard, *Ecuadoreans Win Asset Seizure Against Chevron*, COURTHOUSE NEWS
    SERVICE (October 17, 2012) ................................................................................ 2

Declan McCullagh, *Chevron targets Google, Yahoo, Microsoft e-mail accounts*, CNET
    (Oct. 11, 2012) ............................................................................................. 18, 19

## MEMORANDUM OF POINTS AND AUTHORITIES

I.      **INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 45(c), Non-Party John Doe users of Hotmail email account hereby move to quash Chevron's subpoena issued from this Court and served on Microsoft on or around September 18, 2012 seeking identity and email usage information about 30 email accounts from 2003 to the present.  In addition to linking their identities with their speech, this information will likely reveal the location and associations of these non-parties, over nearly a decade.

Chevron's sweeping subpoena would reveal an enormous amount of sensitive details about the Does, despite the fact that they are not parties to the underlying litigation. Chevron seeks identities and nine years of information about the Does' use of their email accounts—including IP addresses, which correlate to specific geographic locations, and the date and time of each log-in. This information would allow Chevron to create a comprehensive and detailed map of each person's movements over a nine-year period.  This information would also allow Chevron a virtual itinerary of who each individual has met with, what buildings they have worked out of, what organizations they have worked with, and other potentially sensitive information implicating associational freedoms, which are protected by the First Amendment. Furthermore, the subpoena is facially overbroad and seeks information well beyond the permissible scope of discovery.

II.     **STATEMENT OF FACTS**

This case arises from two decades of contentious environmental litigation.  In 1993, a group of Ecuadorian citizens sued Texaco, Inc. in the United States for pollution and other damage caused by oil extraction activities in the Amazon. Chevron Corporation acquired Texaco in 2001, and successfully fought to move the litigation to Ecuador's judicial system in 2003.  In 2011, an Ecuadorian court handed down a judgment of more than $17 billion against the oil company.

Chevron's strong feelings about its opponents in the litigation are well documented. Chevron's former company spokesman Donald Campbell, for instance, once said, "we're going

to fight this until hell freezes over—and then we'll fight it out on the ice."[1]  On February 1, 2011, Chevron filed suit against more than 50 lawyers, organizations, plaintiffs, and other individuals involved in the environmental case in Ecuador, alleging that they obtained the judgment through fraud and other illegal means. *Chevron Corp. v. Donziger, et al.*, Case No. 11-cv-0691 (LAK) (S.D.N.Y.).  This case is the source of the subpoenas at issue here.

### A.   Chevron's September 18, 2012 Subpoenas to Microsoft, Yahoo!, and Google

In September 18, 2012, Chevron issued sweeping subpoenas to Microsoft, Yahoo!, and Google demanding identity and email usage information associated with 101 email accounts from 2003 to present.  The subpoena to Microsoft was issued by this Court, and is the one this motion seeks to quash.[2]

The subpoena to Microsoft specifically seeks identity information and email usage records associated with 30 email addresses. For each, it demands the production of all documents related to

(A)   identity of the users of all of the listed email addresses, including but not limited to documents that provide all names, mailing addresses, phone numbers, billing information, date of account creation, account information and all other identifying information associated with the email address under any and all names, aliases, identities or designations related to the email address; [and]

(B)   the usage of all of the listed email addresses, including but not limited to documents that provide IP logs, IP address information at time of registration and subsequent usage, computer usage logs, or other means of recording information concerning the email or Internet usage of the email address[.]

Declaration of Michelle Harrison (hereafter "Harrison Decl.") Ex. 1.

Despite the broad wording of category (B), Chevron's attorneys have verbally clarified that this description was not intended to include any contents of communications or email header information, which would reveal the names and IP addresses of senders and recipients of

---

[1] Barbara Leonard, *Ecuadoreans Win Asset Seizure Against Chevron*, COURTHOUSE NEWS SERVICE (October 17, 2012) https://www.courthousenews.com/2012/10/17/51369.htm.

[2] The subpoenas to Google and Yahoo! were issued by the District Court for the Northern District of California, and the Does have separately moved to quash that subpoena in that court.

messages. Nevertheless, Chevron seeks IP addresses associated with the computers that logged into the email accounts, the dates and times of log-in, session durations, and possibly information about other services used by the account holder.[3] Based on informal conversations between Does' counsel and Microsoft, it appears that the provider's policy is not to keep nine years of this IP-related information. However, Microsoft has not given the precise timeframe or amount of information retained for each Doe.

Microsoft attempted to notify the affected account holders about the subpoenas by email, though it is unclear how many actually received notice. The account holders of three of these accounts now bring this motion to quash the subpoena in its entirety because it infringes upon fundamental constitutional rights to anonymity and association, and is facially overbroad.

### B.    The Non-Party John Doe Movants

The three Does are individuals who have had some connection to the litigation against Chevron in Ecuador or related environmental advocacy, but none of them is a defendant in the underlying action.

The declaration submitted in support of this motion is from John Doe, a movant who had no direct connection with the litigation against Chevron.[4] From 2005 to 2008, he worked for a non-profit advocacy organization and engaged in broader advocacy efforts concerning the environmental impact of Chevron's former oil concession in the Amazon.[5] Declaration of John Doe (Owner of simeontegel@hotmail.com) ¶¶ 4-5 (hereafter "John Doe Decl."). John Doe almost never used his Hotmail account in connection with his advocacy work. John Doe Decl. ¶ 7. He maintained a separate email account for correspondence related to that campaign. John Doe Decl. ¶ 7.

John Doe is now a full-time professional journalist based in Latin America, and his articles have been published in a number of prominent international media outlets. John Doe

---

[3] The information responsive to Chevron's subpoenas may vary from provider to provider, because they may not all retain precisely the same data.

[4] As noted in the Harrison Declaration filed herewith, the Does have provided the Court a representative declaration to illustrate the issues that individual faces.  Should the Court deem it necessary, counsel can provide declarations from all three of the Does with Microsoft accounts.

[5] This motion's use of masculine pronouns to refer to John Doe is generic and should not be construed as an admission of gender.

Decl. ¶ 4.  He has used his Hotmail account for personal and professional communications for about 13 years. John Doe Decl. ¶ 9.  Ensuring the privacy of this account is particularly important to him because he uses it to communicate with sources, and maintaining the confidentiality of that account is an important part of his job. John Doe Decl. ¶ 8.  As a reporter in Latin America, he works on many stories where his personal security, and those of his confidential sources, is an issue of great concern.  John Doe Decl. ¶ 10. John Doe believes his use of his email account to communicate with his sources would be chilled if Chevron obtained details about his account. John Doe Decl. ¶ 13.

John Doe feels harassed by Chevron's attempt to obtain information about his identity and past involvement in his advocacy work. John Doe Decl. ¶ 14. John Doe is no longer engaged in that activity, but if Chevron gains access to information about his account, John Doe would be intimidated and deterred from engaging in activism or litigation against Chevron in the future. John Doe Decl. ¶ 12.  His participation in other political and activism campaigns would be chilled more generally, as well. John Doe Decl. ¶ 13.

There is already evidence that Chevron's demand is tremendously overbroad. For example, Chevron originally included the email address kevinjonheller@gmail.com in the subpoena issued to Google. That email account belongs to Kevin Jon Heller, an Australian law professor and well-known blogger and journalist. Professor Heller's information was apparently sought because he had exchanged two non-substantive emails with the Ecuadorian plaintiffs' lead attorney, Steven Donziger. Harrison Decl. Ex. 2. After Professor Heller learned of the subpoena for nine years of information about his email use and secured legal representation from the American Civil Liberties Union, Chevron abruptly withdrew its demand for information about his account. In a blog post about the incident, Professor Heller said he felt Chevron's demand was nothing more than an attempt "to harass and intimidate me." *Id*.

Chevron has made no attempt to explain why the other Does—against whom Chevron has alleged no cause of action—have been targeted by these discovery requests, nor given any indication why it has demanded over nine years of usage records about each of them.

### C.    The Nature of the Information Sought by Chevron

The information Chevron seeks will enable the company to identify and track the locations of the Does over time, as well as learn when the Does likely met with other people. This is due to the nature of Internet Protocol (IP) addresses.

An IP address is a numeric value used to identify the network location of a computer or set of computers on the Internet. Internet routers use the IP address to decide where to send communications addressed to a particular computer user. Declaration of Seth Schoen ¶ 3 (hereafter "Schoen Decl.").

IP addresses are allocated to Internet service providers and often reflect the general physical location of the area they serve. This means that servers located in New York have IP addresses roughly trackable to New York, and servers in Ecuador have IP addresses roughly trackable to Ecuador. This geographic location information is generally publicly available. For instance, the IP address 199.83.220.233 is easily trackable to San Francisco through free public websites such as www.geobytes.com. Even when location information is not publicly available, a subpoena to an ISP can generally elicit the specific geographic location for a particular IP address.  Schoen Decl. ¶ 12.

ISPs can further delegate these addresses to smaller entities such as businesses, Internet cafés, or smaller ISPs. ISPs can also assign an IP address directly to an individual computer. Schoen Decl. ¶ 4.  Because IP addresses are allocated in this way, they can convey not only approximate information about a computer's location, but also how the computer is connected to the Internet, and what individual or entity is using that computer to connect.  Schoen Decl. ¶ 5.

Many host computers of websites, including the operators of popular web-based email services like Microsoft Hotmail, Yahoo! Mail and Gmail maintain logs that list the IP address of visitors along with date and time information.  Websites that utilize a log-in feature typically maintain a log of IP addresses and other data associated with the particular user who logged in, such as the date and time of log-in and the duration of time the user visited the website. Schoen Decl. ¶ 8.

A large amount of data accumulated over a lengthy period of time that includes IP addresses and dates and times of usage sessions—as one might get from a heavily trafficked and frequently used web service such as an email provider—can readily present a detailed picture of a person's movements from one location to another, especially if that person is an avid laptop or tablet user.  Schoen Decl. ¶ 9. For instance, a laptop will receive a different IP address when it connects to the Internet from different locations. If a laptop's owner uses the machine from her workplace in the morning, a café in the afternoon, and her home in the evening, she will present at least three different IP addresses over the course of a single day. This information could

demonstrate that a person accessed the Internet from a precise physical location, like a building or even a particular organization's office.  Schoen Decl. ¶ 11.

Moreover, this information can reveal a person's physical proximity to other Internet users who may share the same IP address through a wireless device, a router or another form of shared Internet connection. Schoen Decl. ¶ 15. This information could be used to map a person's associates. For example, if Internet usage records showed that two individuals were accessing the Internet from the same IP address on a particular day and time, this would tend to show that they were accessing the same Internet network at the same time. This would suggest they were in the same physical location at the same time, and could create a reasonable inference that they met with each other.  Schoen Decl. ¶ 16.

A person who checks email frequently might access a given email service multiple times per day, and a long-term view of data about that use could reflect significant facts about that person's work habits and personal relationships that could be quite intimate. For example, if the IP logs show that a person signed into his account from an IP address associated with another person's home, that information suggests the user visited that home. If the user signs into his email account using that same IP address late at night and again the following morning, that information creates a reasonable inference that the user spent the night at that home, which may suggest that he has an intimate relationship with the person who lives there.  If the user repeats this log-in pattern over time, it might suggest he spends many nights at that home, and that his relationship with the person living there is a relatively serious one.  Schoen Decl. ¶ 18.

## III.    LEGAL STANDARD

The Federal Rules of Procedure generally provide that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense[.]"  Fed. R. Civ. P. 26(b)(1). However, the courts impose a higher standard when a party seeks discovery encroaching upon freedoms protected by the First Amendment. *See, e.g., Fed. Election Comm'n v. Larouche Campaign*, 817 F.2d 233, 234-35 (2d Cir. 1987) (requiring agency to demonstrate need beyond mere relevance to an investigation to justify compelling disclosure of the names of campaign contributors). Under those circumstances, the party must show that the "information sought is *highly relevant* to the claims or defenses in the litigation—a more demanding standard of relevance than that under Federal Rule of Procedure 26(b)(1)." *Perry v. Schwarzenegger*, 591

F.3d 1126, 1141 (9th Cir. 2010) (emphasis added).  Furthermore, the discovery request must be "carefully tailored to avoid unnecessary interference with protected activities, and the information must be otherwise unavailable." *Id*.

A court may quash a subpoena if it "requires disclosure of privileged or other protected matter" or "subjects a person to undue burden." Fed. R. Civ. P. 45(c)(3)(A)(iii), (iv).  *See, e.g., Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 814 (9th Cir. 2003). Similarly, pursuant to N.Y. C.P.L.R. § 3103, a court "may at any time on its own initiative, or on motion of any person from whom discovery is sought, make a protective order denying, limiting, conditioning or regulating the use of any disclosure device. Such order shall be designed to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts." N.Y. C.P.L.R. § 3103(a). Moreover, pursuant to N.Y. C.P.L.R. § 2304, the court "may quash, fix conditions or modify a subpoena" and "[r]easonable conditions may be imposed upon the granting or denial of a motion to quash or modify." *See, e.g., Carvel Corp. v. Lefkowitz*, 431 N.Y.S.2d 609 (N.Y. Sup. Ct. 1979) (restricting sweeping subpoena).

This Court is the appropriate venue for this motion because subpoenas must be challenged before the issuing court, not the court that oversees the underlying litigation.  *See* FED. R. CIV. P. 45(c)(3)(A) ("On timely motion, the *issuing court* must quash or modify a subpoena[.]") (emphasis added).

## IV.   ARGUMENT

### A.   The Subpoena Violates the Does' Constitutional Rights Under the First Amendment.

The subpoena should be quashed in its entirety because it violates the Does' First Amendment rights to anonymous speech and association. *See, e.g.*, *Church of the Am. Knights of the KKK v. Kerik*, 356 F.3d 197, 208 (2d Cir. 2004). The Court should treat this subpoena with particular skepticism because compliance will chill political speech about damage to the environment and harm to people caused by oil exploration and related activities—speech that receives the highest level of First Amendment protection.  *Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988) (describing the First Amendment protection of "core political speech" to be "at its zenith").

## 1. The Subpoena Violates the Does' First Amendment Right to Anonymous Speech.

Under the broad protections of the First Amendment, speakers have not only a right to organize and engage in political advocacy, but also the right to do so anonymously. Accordingly, the First Amendment requires that those who seek to discover the identities of their critics demonstrate a compelling need for such identity-related information before obtaining that discovery.  There is no such need in this case.

### a. The Right to Engage in Anonymous Speech is Protected By the First Amendment.

The United States Supreme Court has consistently defended the right to anonymous speech in a variety of contexts, noting that "[a]nonymity is a shield from the tyranny of the majority . . . [that] exemplifies the purpose [of the First Amendment] to protect unpopular individuals from retaliation . . .  at the hand of an intolerant society."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).  *See also Talley v. California*, 362 U.S. 60, 64 (1960) (finding a municipal ordinance requiring identification on hand-bills unconstitutional, noting that "[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind").  Anonymity receives the same constitutional protection whether the means of communication is a political leaflet or an Internet message board or an email.  *See Reno v. ACLU*, 521 U.S. 844, 870 (1997).  *See also, e.g., Doe v. 2theMart.com*, 140 F. Supp. 2d 1088, 1093 (W.D. Wash. 2001) ("The right to speak anonymously extends to speech via the Internet. Internet anonymity facilitates the rich, diverse, and far ranging exchange of ideas.").  These fundamental rights protect anonymous speakers from forced identification, be they from overbroad statutes or unwarranted discovery requests.

Email addresses that appear to reflect an individual's name are entitled to just as much protection as email addresses that do not.  By its very request for identity information associated with every email address listed in the subpoena, Chevron apparently agrees that the identity of each account holder remains in dispute. In a statement to the San Francisco Chronicle, Chevron admitted as much, explaining that the company seeks the identities behind the accounts because

it "is trying to find out whether some of the e-mail addresses actually belong to key figures in the case[.]"[6]

Yet in its Opposition to Defendants' Motion to Quash the subpoenas to Yahoo! and Google, recently filed in the District Court for the Northern District of California, Chevron takes a different approach, claiming that it is entitled to learn the identities of the Does because it already knows them from the names embedded in some of the addresses.  *See* Chevron Corporation's Opposition to the RICO Defendants' Motion to Quash Subpoenas to Google Inc. and Yahoo! Inc. ("Chevron Opp. Defs.' Mot. Quash"), *Chevron Corp. v. Donziger*, No. C-12-80237 CRB NC (N.D. Cal.), filed Oct. 19, 2012, Docket No. 26, at 14-15.  That, of course, would make these requests redundant and wholly unnecessary. Chevron further states that "participants in Defendants' enterprise have [not] evinced a desire to conceal their identities [except to] facilitate fraudulent conduct." *Id*. at 15.  However, Chevron has made no allegations of fraud against the Does, and the First Amendment right to anonymous speech does not place a burden on a speaker to "evince a desire."

If Chevron believes that some of the email addresses are owned, used, or controlled by the parties to the litigation, the proper vehicle for confirming that belief would be a discovery request directed to those parties.  However, because Chevron has requested identifying information regarding non-parties—some of whose identities are not known with certainty by Chevron, and some of whose identities are entirely unknown by Chevron—this Court should treat all of the Does as anonymous speakers, regardless of whether their email addresses appear to reflect a name.

### b.  Anonymous Speakers Enjoy a Qualified Privilege Under the First Amendment.

Because the First Amendment protects anonymous speech and association, efforts to use the power of the courts[7] to pierce anonymity are subject to a qualified privilege.  Courts must "be vigilant . . . [and] guard against undue hindrances to . . . the exchange of ideas." *Buckley v. Am.*

---

[6] David R. Baker, *Chevron seeks e-mail logs in Ecuador suit*, S.F. CHRONICLE (Oct. 1, 2012), http://www.sfgate.com/business/article/Chevron-seeks-e-mail-los-in-Ecuador-suit-3904006.php.
[7] A court order, even if granted to a private party, is state action and hence subject to constitutional limitations.  *See, e.g., New York Times v. Sullivan*, 376 U.S. 254, 265 (1964); *Shelley v. Kraemer*, 334 U.S. 1, 14 (1948).

*Constitutional Law Found.*, 525 U.S. 182, 192 (1999).  This vigilant review "must be undertaken and analyzed on a case-by-case basis," where the court's "guiding principle is a result based on a meaningful analysis and a proper balancing of the equities and rights at issue."  *Dendrite Int'l v. Doe No. 3*, 775 A.2d 756, 761 (N.J. App. 2001).  Just as in other cases in which litigants seek information that may be privileged, courts must consider the privilege before authorizing discovery.  *See*, *e.g.*, *Sony Music Entm't Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 565 (S.D.N.Y. 2004) ("Against the backdrop of First Amendment protection for anonymous speech, courts have held that civil subpoenas seeking information regarding anonymous individuals raise First Amendment concerns."); *Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987) (citing *Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433, 438 (10th Cir. 1977)) ("[W]hen the subject of a discovery order claims a First Amendment privilege not to disclose certain information, the trial court must conduct a balancing test before ordering disclosure.").  As one court described in an early Internet anonymity case, "[p]eople who have committed no wrong should be able to participate online without fear that someone who wishes to harass or embarrass them can file a frivolous lawsuit and thereby gain the power of the court's order to discover their identity." *Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573, 578 (N.D. Cal. 1999).

The constitutional privilege to remain anonymous is not absolute.  Plaintiffs may properly seek information necessary to pursue meritorious litigation.  *Id.* at 578 (First Amendment does not protect anonymous Internet users from liability for tortious acts such as defamation); *Doe v. Cahill*, 884 A.2d 451, 456 (Del. 2005) ("Certain classes of speech, including defamatory and libelous speech, are entitled to no constitutional protection.").  However, litigants may not use the discovery power to uncover the identities of people who have simply made statements the litigants dislike or who associate with those whom they dislike.  Accordingly, courts evaluating attempts to unmask anonymous speakers in cases similar to the one at hand have adopted standards that balance one person's right to speak anonymously with a litigant's legitimate need to pursue a claim.

Here Chevron's subpoenas chiefly seek identity and location information from non-parties.  While several of the email addresses do appear to belong to parties in the case, Chevron has made no attempt to identify them as such or segregate them from non-parties.  *See* Defendants' Motion to Quash Chevron Corporation's Subpoenas to Google Inc. and Yahoo! Inc.,

*Chevron Corp. v. Donziger*, No. C-12-80237 CRB NC (N.D. Cal.) filed October 5, 2012, Docket No. 4.

The seminal case setting forth First Amendment restrictions upon a litigant's ability to compel an online service provider to reveal an anonymous non-party's identity is *Doe v. 2theMart.com*, *supra*, in which the Western District of Washington adopted a four-part test for protecting anonymous speakers that has been followed by courts around the country.[8] In order for the litigant to obtain the anonymous non-party's identity, he must show:

> (1) the subpoena seeking the information was issued in good faith and not for any improper purpose,
>
> (2) the information sought relates to a core claim or defense,
>
> (3) the identifying information is directly and materially relevant to that claim or defense, and
>
> (4) information sufficient to establish or to disprove that claim or defense is unavailable from any other source.

*2theMart.com*, 140 F. Supp. 2d at 1095 (line breaks added for clarity).  The district court further stated "non-party disclosure is only appropriate in the exceptional case where the compelling need for the discovery sought outweighs the First Amendment rights of the anonymous speaker." *Id*.

As the *2theMart.com* court accurately and cogently outlined the important First Amendment interests implicated when a party seeks to unmask anonymous third-party speakers, and the holding and reasoning of *2theMart.com* and its progeny should apply here.

> **c.  As Chevron's Subpoena Demand for Identity Information Cannot Survive the Scrutiny Required By the First Amendment, It Must Be Quashed Under Federal Rule of Civil Procedure 45.**

At the outset, it appears clear that Chevron fails at least two of the four steps of the *2theMart.com* First Amendment test.  While it has not yet made a showing on the remaining two steps, they seem unlikely to succeed on those, either.  Thus, the subpoenas must be quashed.

---

[8] *See, e.g., USA Technologies, Inc. v. Doe*, 713 F. Supp. 2d 901, 906 (N.D. Cal. 2010); *Enterline v. Pocono Medical Center*, 751 F. Supp. 2d 782, 787 (M.D. Pa. 2008); *Mobilisa, Inc. v. Doe*, 170 P.3d 712, 719 (Ariz. App. 2007).

### i. Chevron Did Not Issue This Subpoena in Good Faith or for Any Proper Purpose.

Chevron has failed to explain the purpose of its subpoenas for information regarding individuals against whom it has not alleged any causes of action. The subpoenas seek the identities of the owners of a total of 101 email addresses (including 30 Hotmail addresses), along with associated IP address and other information related to those accounts. Many of the addresses appear to include names similar to both parties and non-parties mentioned by Chevron in the underlying complaint, while others do not appear to include names at all.

Assuming Chevron did not choose the email addresses randomly, it is likely that Chevron suspects they belong to individuals somehow associated with or supportive of its opponents in either its underlying lawsuit in New York or the third lawsuit that the New York case relates to, which started in the New York but was transferred to Ecuador at Chevron's demand. As discussed in greater detail below, the risk that a political opponent or critic may have his or her identity, location, emailing habits, and other personal information over *nine years* revealed simply by dint of association with other activists critical of Chevron, even activists who might themselves be legitimately subject to litigation, will have a tangible chilling effect on future political speech. Indeed, many of the non-parties named by Chevron in its subpoenas feel harassed and intimidated by Chevron's pursuit of their personal information. *See, i.e.,* John Doe Decl. ¶¶ 11-14.

### ii. Chevron Has Made No Showing that the Information Sought Relates to a Core Claim or that it is Directly and Materially Relevant to that Claim or Defense.

Before Chevron may obtain the discovery it seeks, it must show that the information requested relates to a core claim or defense *and* that the identity information is directly and material relevant to that claim or defense. *See 2theMart.com*, 140 F. Supp. 2d at 1096. It cannot do so. The subpoenas at issue here seek the disclosure of the identity of as many as 101 individuals, along with IP logs reflecting locations and all other "usage logs" associated with the accounts, over the course of nine years. It is exceedingly unlikely that all this information, or even a sizeable percentage of it, is in any way relevant to Chevron's claims, much less directly and materially relevant to those claims.

An example of the staggering overbreadth of Chevron's subpoenas is the inclusion of Professor Heller's email address in the subpoena to Google.  Heller—a blogger, journalist, and law professor—has no apparent connection to Chevron's underlying lawsuit.  The "sum total" of his interaction with defendant Steven Donziger was a pair of non-substantive emails.  Harrison Decl. Ex. 2. Chevron has made no allegations against Professor Heller, has never sought to add him as a defendant to the underlying lawsuit, and was already aware of his identity at the time it issued the subpoenas.  And yet, as Professor Heller notes, Chevron sought nine years of information related to his use of his email account. He considered it "a remarkably intrusive request; I haven't even been blogging for nine years." Professor Heller secured counsel and attempted to ascertain why exactly Chevron was seeking such an extensive amount of his personal information.  Although Chevron refused to explain why they sought his information in the first place, the company quietly dropped its request for information about him alone.  *Id.*

Chevron could not show that its request for information about Professor Heller had the slightest relationship to any claim or defense it might have in the underlying litigation, much less that nine years of IP logs are directly and materially relevant to that case. Yet if Chevron's subpoenas are to survive, Chevron must now make this showing as to each email address listed in its subpoenas.  It cannot.

### iii.   Chevron Has Made No Showing that the Information Sought Is Unavailable from Any Other Source.

Litigants should undertake discovery from non-party witnesses only if party discovery has been exhausted: "[T]hese witnesses are not parties to the action, and they should not be burdened with the annoyance and expense of producing the documents sought unless the plaintiff is unable to discover them from the defendant." *Bada Co. v. Montgomery Ward & Co.*, 32 F.R.D. 208, 209-10 (S.D. Cal. 1963). Accordingly, in order for Chevron to enforce its subpoenas, it must demonstrate that "the information it needs to establish its defense is unavailable from any other source."  *See 2theMart.com*, 140 F. Supp. 2d at 1097.  It cannot do so.

Chevron already has in its possession a vast amount of email from the parties and direct witnesses.  Chevron Opp. Defs.' Mot. Quash at 4.  If the question Chevron seeks to answer with these subpoenas is truly whether the owners of the email addresses acted in concert with the parties, then surely the best way to learn the answer would be to ask the parties directly in regular discovery.  If Chevron opposes this motion based on the grounds that the email addresses

about which they seek information are in fact not anonymous, then the request to Microsoft for their identities is mere confirmation of what Chevron already knows.  But if that is true, then Chevron cannot show that the information it seeks is unavailable from any other source; it could simply propound discovery on the people it suspects of controlling those addresses for any further confirmation it requires.  If Chevron seeks to map the relationship between parties and non-parties via the IP logs it requests, then surely the best evidence of those relationships is the testimony of those very people, testimony that could be obtained in party discovery.

In sum, Chevron cannot satisfy the *2theMart.com* test, and its attempt to seek the identities of the Does must be quashed because it violates the Does' First Amendment right to anonymity.

### 2.    The Subpoena Violates the Does' First Amendment Right to Association.

Chevron's subpoena intrudes upon the Does' constitutionally guaranteed right to association. For this reason alone, the subpoena should be quashed in their entirety.

#### a.    The Does Enjoy a First Amendment Right to Political Association and to Advocate Controversial Views as a Group.

The First Amendment protects the freedom to associate and express political views as a group.  *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449, 460-62 (1958).  This right is intertwined with the right to freedom of expression, and "like free speech, lies at the foundation of a free society." *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (quoting *Shelton v. Tucker*, 364 U.S. 479, 486 (1960) (internal quotation marks omitted)).  This constitutional protection is critical because  "[e]ffective advocacy of both public and privacy points of view, particularly controversial ones, is undeniably enhanced by group association[.]" *NAACP v. Alabama*, 357 U.S. at 460; *Bates v. City of Little Rock*, 361 U.S. 516, 522-23 (1960) (the Constitution protects freedom of association to encourage the "advancing ideas and airing grievances").  The Does' politically charged advocacy efforts are precisely the sort of expression the First Amendment seeks to protect.

The Supreme Court has repeatedly held that compelled disclosure of an advocacy group's membership lists harms freedom of association because "it may induce members to withdraw from the association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of their exposure." *NAACP v. Alabama*, 357 U.S. at 462-63. *See also Bates*, 361 U.S. at 523; *Gibson v. Florida Legislative*

*Investigation Comm.*, 372 U.S. 539 (1963). This rule applies with equal force to attempts to compel disclosure of the Does' identities here.

Privacy in one's associational ties is also closely linked to freedom of association: "Inviolability of privacy in group association may in many circumstances be indispensible to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP v. Alabama,* 357 U.S. at 462. Allowing Chevron access to information about the Does' locations over time would reveal a wealth of details about their habits and day-to-day patterns that are intimately tied to their associational activities. *United States v. Jones*, 132 S. Ct. 945, 954 (2012) (Sotomayor, J., concurring) (continual location monitoring over a prolonged period "reflects a wealth of detail about [a person's] familial, political, professional, religious, and sexual associations."). As the D.C. Circuit has noted, such observation of a person's movements

> reveals types of information not revealed by short-term surveillance, such as what a person does repeatedly, what he does not do, and what he does ensemble. . . . A person who knows all of another's travels can deduce whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband, an outpatient receiving medical treatment, an associate of particular individuals or political groups—and not just one such fact about a person, but all such facts.

*United States v. Maynard,* 615 F.3d 544, 562 (D.C. Cir. 2010), *aff'd sub nom. Jones*, 132 S. Ct. 945.

Chevron's subpoenas are squarely aimed at identifying and mapping the movements of individuals it believes are involved in political expression: specifically, environmental litigation against the oil company and related activism activities, all of which is highly protected speech. *See, e.g.*, *NAACP v. Button*, 371 U.S. 415, 429-31 (1963) (litigation is a form of political speech); *Thomas v. Collins*, 323 U.S. 516, 537 (1945) (First Amendment protects advocacy to "persuade to action").

Among other things, the information Chevron seeks could tell the company when the Does were in the United States or Ecuador; when they were in a particular town, building, or even a particular organization's office; and when each Doe was in the same place at the same time as other individuals whose email usage information is revealed, meeting with each other. *See* Schoen Decl. ¶ 17.  These discovery requests directly implicate the movants' right to "engage in association for the advancement of beliefs and ideas," and are therefore subject to heightened scrutiny. *NAACP v. Alabama*, 357 U.S. at 460.

**b. The Does Have a Qualified First Amendment Privilege Subject To Heightened Scrutiny That Can Only Be Overcome By a Compelling Interest.**

Individuals may assert privilege to protect such information when a civil discovery request threatens the freedom of association. *NAACP v. Alabama*, 357 U.S. at 460-63; *Perry*, 591 F.3d at 1140; *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 481 (10th Cir. 2011). When discovery requests infringe upon political expression and association, the courts apply heightened discovery standards to protect those constitutional values. *FEC v. LaRouche Campaign, Inc.*, 817 F.2d 233, 234-35 (2d Cir. 1987) (requiring agency to demonstrate need beyond mere relevance to an investigation to justify compelling disclosure of the names of campaign contributors); *Perry*, 591 F.3d at 1140.

The Supreme Court has made clear that infringements on freedom of association may be survive constitutional scrutiny only when they "serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984); *see also NAACP v. Button*, 371 U.S. at 341; *Knox v. SEIU, Local 1000*, 132 S. Ct. 2277, 2291 (2012) (burden on freedom of association "must serve a compelling interest and must not be significantly broader than necessary to serve that interest.").

Members of an association may assert a First Amendment qualified associational privilege where a discovery request adversely affects their "mission of advocacy and chills their ability to freely speak or to associate." *Sherwin-Williams Co. v. Spitzer*, 61 ERC (BNA) 1182 (N.D.N.Y. 2005). If the members of the association can demonstrate "a reasonable probability that compelling disclosure will lead to some form or specter of harassment, threat, or reprisal of the organization and/or its members, such commanded disclosure runs afoul of the First Amendment." *Id.*, (citing *Buckley v. Valeo,* 424 U.S. 1, 74 (1976)); *Local 1814, Int'l Longshoremen's Assoc. AFL-CIO v. Waterfront Comm'n. of New York Harbor,* 667 F.2d 267, 271-73 (2d Cir. 1981); *In re Grand Jury Proceedings,* 776 F.2d 1099, 1103 (2d Cir. 1985). The Does' burden to make this showing is "light" due to the "crucial place speech and associational rights occupy under our constitution[.]" *N.Y. State National Organization for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989).

16

Once the Does make a *prima facie* showing of hostility and adverse impact, the burden shifts to Chevron to demonstrate a "compelling [state] need" for the information that survives "exacting scrutiny." *In re Grand Jury Proceedings,* 776 F.2d at 1102-03 (citing *Bates,* 361 U.S. at 524 and *Buckley v. Valeo,* 424 U.S. at 64). The Court must not compel disclosure unless the information sought is "substantially related" to that compelling interest, and would not have an "unnecessary impact on protected rights of speech, press or association." *Int'l Longshoremen's Assoc. v. Waterfront Comm'n,* 667 F.2d 267, 271 (2d Cir.1981); *Buckley v. Valeo,* 424 U.S. at 64; *In re Grand Jury Proceedings,* 776 F.2d at 1103.

### i. The Does' Right to Association Will be Harmed if Their Identities and Email Usage Information is Disclosed

As the declaration filed with this motion shows, compliance with the subpoena is likely to create "some form or specter of harassment, threat, or reprisal" for the Does, chilling their freedom to associate. *Buckley v. Valeo*, 424 U.S. at 74.

As John Doe's declaration makes clear, he feels harassed by Chevron's attempt to obtain the information about his past involvement in advocacy against the company, and fears further harassment if Chevron actually gains access to the information it seeks. John Doe Decl. ¶ 14.

The declaration also reflects a likelihood of chilled expression in the future. John Doe states that if he had known that his email usage information and location would be revealed to Chevron, his political expression at the time he was assisting with participating in advocacy efforts would have been chilled. John Doe Decl. ¶ 11. He says his future political and associational activities related to Chevron will be chilled if the company obtains the personal information it seeks. John Doe Decl. ¶ 12. He believes his associational activities will likely be chilled more generally, as well. John Doe Decl. ¶ 13.

Thus, John Doe has made a *prima facie* showing that Microsoft's compliance with Chevron's subpoena will chill the Does' constitutionally protected associational rights.

### ii. Disclosure of the Does' Information Does Not Serve a Compelling Interest and Is Not the Least Restrictive Means of Furthering a Compelling Interest.

Chevron cannot satisfy its burden of showing that the information it seeks about the Does is serves a compelling interest and is the least restrictive means of obtaining the desired information. *Int'l Longshoremen's Assoc.,* 667 F.2d at 271; *In re Grand Jury Proceedings,* 776

F.2d at 1103. To determine whether Chevron should obtain the discovery it seeks, the Court must balance the "burdens imposed on individuals and associations against the  . . . interest in disclosure" to determine whether the "interest in disclosure . . . outweighs the harm" to the Does' associational rights.  *Perry,* 591 F.3d at 1140 (quoting *Buckley v. Valeo*, 424 U.S. at 72). Critically, Chevron must demonstrate that the information sought is "highly relevant to the claims or defenses in the litigation," that the subpoenas were "carefully tailored to avoid unnecessary interference with protected activities," and that the information sought is "otherwise unavailable." *Id*. Chevron can show none of these things.

The government may well have a compelling interest in making sure that parties to litigation receive the information they need to properly litigate their cases in the interest of the fair administration of justice. But the scope of Chevron's subpoenas far exceeds any such interest. The company seeks a vast amount of information that is not "highly relevant" to the claims in the underlying litigation. Indeed, a Chevron spokesman readily admitted to the press that some of these email accounts are likely to be "legitimate" and "used for benign purposes."[9] Professor Heller's experience, discussed above in Section A.1.b.ii, further underscores this likelihood: Chevron's request for his information had no connection whatsoever to the company's legal claims.  There is no reason to believe this is not true the case for information sought about many other individuals through these subpoenas.

Furthermore, there is no indication that the subpoenas were carefully tailored to avoid infringing the Does' associational freedoms.  Indeed, the discovery demands indiscriminately seek information about each and every one of the 101 email accounts since 2003, without any tailoring or limitation whatsoever. The careless scope of these subpoenas is underscored by the fact that Google did not even launch Gmail until 2004, meaning that Google is unlikely to have any responsive information for more than a year covered by Chevron's subpoena simply because its email service did not exist.[10]

---

[9] Declan McCullagh, *Chevron targets Google, Yahoo, Microsoft e-mail accounts*, CNET (Oct. 11, 2012), http://news.cnet.com/8301-13578_3-57530915-38/chevron-targets-google-yahoo-microsoft-e-mail-accounts/.

[10] Gmail, http://en.wikipedia.org/w/index.php?title=Gmail&oldid=518861456 (last visited Oct. 22, 2012).

Finally, the subpoenas to the email providers are not the least restrictive means of obtaining the information Chevron seeks.  A company spokesperson told the San Francisco Chronicle that subpoenas were issued for the purpose of

> trying to find out whether some of the e-mail addresses actually belong to key figures in the case, including the opposing side's lawyers and a court-appointed expert whom Chevron accuses of fraud. Some of the participants, he said, have set up multiple e-mail accounts, and tracing the communication among them could help the company prove its contention that the lawsuit is nothing more than an elaborate extortion scheme.

Baker, *Chevron seeks e-mail logs in Ecuador suit*, S.F. CHRONICLE.[11] Chevron could learn this information by seeking discovery directly from those "key figures" and "participants" to ask whether the email addresses belong to them, rather than issuing sweeping subpoenas to third-party service providers that implicate the First Amendment rights of scores of people who are not parties to the case.

Chevron's fishing expedition violates the Does' associational rights, and the subpoena should be quashed in its entirety for this reason.

### B.     The Subpoena Is Facially Overly Broad and Should be Quashed in Its Entirety.

Finally, the Court should quash this subpoena under Federal Rule of Civil Procedure 26(c) because it is grossly overbroad as drafted, and is therefore oppressive and unreasonable. *See, e.g.*, *McMann v. SEC*, 87 F.2d 377, 379 (2d Cir. 1937) (L. Hand, J.) (A discovery request is unreasonable when "it is out of proportion to the end sought," as when it amounts to "an exploratory investigation whose purposes and limits can be determined only as it proceeds."); *United States v. IBM*, 83 F.R.D. 97, 106-07 (S.D.N.Y. 1979) ("To the extent a subpoena sweepingly pursues material with little apparent or likely relevance to the subject matter it runs the greater risk of being found overbroad and unreasonable."); *United States ex rel. Sasaki v. N.Y. Univ. Med. Ctr.*, 2011 U.S. Dist. LEXIS 95059, at **8-9 (S.D.N.Y. Aug. 23, 2011) (limiting scope of subpoena to non-party to relevant time period).

---

[11] Chevron explained its rationale similarly to another media outlet: "We know the plaintiffs' lawyers created e-mail addresses intended to be aliases to disguise the ultimate user, and used dozens of email accounts to transfer fraudulent documents and to try to conceal their scheme. Among other things, the subpoenas serve to flush out which e-mail addresses are legitimate and have been used for benign purposes." McCullagh, *Chevron targets Google, Yahoo, Microsoft e-mail accounts*, CNET.

The subpoena is overly broad as drafted because it seeks nine years of detailed email usage information about 30 separate email addresses, thus demanding a catalog of the account holders' daily movements since 2003. Even as verbally clarified by Chevron, the data disclosed here would not only constitute an invasion of the Does' personal privacy, but also include a tremendous amount of information wholly irrelevant to Chevron's claims and defenses, which is beyond the scope of reasonable or fair discovery.

Quashing the subpoena in its entirety is especially important here, where it is likely that a number of the non-parties whose information is sought are not present in the United States and do not speak English sufficiently to engage in sophisticated American litigation. Many may not have understood the notices that Microsoft emailed (which were presumably in English), much less been able to muster the wherewithal to secure counsel in New York to represent them here.

It is also important because of the reasonable concern that the real purpose of these subpoenas is to harass and intimidate the activists, interns, young lawyers, volunteers and journalists, both in the United States and around the world, who have shown some sympathy for or supported the Ecuadoran plaintiffs who sought judicial recourse against Chevron. Regardless of whether those fears are well founded, the Court should not permit Chevron's unnecessary and unwarranted fishing expedition into these individuals' day-to-day activities without a serious and well-documented showing that each of these individuals was in fact part of the conspiracy it alleges.

## V.    CONCLUSION

For the foregoing reasons, the September 18, 2012 subpoena served by Chevron upon Microsoft should be quashed in its entirety.

DATED:  October 22, 2012                    Respectfully submitted,


                    _____/s/ Peter Henner_____
                    Peter Henner, Esq.
                    Bar Roll No. 101956
                    P.O. Box 326
                    Clarksville, NY 12041-0326
                    Tel. (518) 768-8232
                    Fax (518) 768-8235
                    Email: peter@peterhenner.com

Cindy A. Cohn, Esq.
Marcia Hofmann, Esq.
(*pro hac vice* application pending)
Nathan Cardozo, Esq.
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone:  (415) 436-9333
Facsimile:   (415) 436-9993

Marco Simons (SBN 237314)
marco@earthrights.org
EARTHRIGHTS INTERNATIONAL
1612 K Street NW, Suite 401
Washington, DC 20006
Telephone: (202) 466-5188

*Counsel For Non-Party John Doe Movants*