UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                        :

CHEVRON CORPORATION,                :

                 Plaintiff,          :

        -against-               :   Case No. 1:12-MC-65 GLS/CFH

STEVEN DONZIGER, et al.,         :

               Defendants.        :

-------------------------------------------------------x

**CHEVRON CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION
TO MOTION OF NON-PARTY JOHN DOE MOVANTS TO QUASH SUBPOENAS
TO MICROSOFT, INC. SEEKING IDENTITY AND EMAIL USAGE INFORMATION**

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ..................................................................................................1

II.    BACKGROUND ...................................................................................................3

III.   ARGUMENT .......................................................................................................7

      A.   The Does Lack Standing to Challenge the Subpoena as a Whole and
            May Challenge Its Application Only to the Accounts that They Own. ......................7

      B.   The Subpoena Makes Reasonable Requests that Courts Routinely Grant. .................8

          1.   Courts Routinely Require Production of the Information that
               Chevron Seeks. ....................................................................................8

          2.   The Subpoenaed Information Will Materially Support Chevron's
               Claims in the RICO Action. ...................................................................10

          3.   The Subpoena Is Not Overbroad. ............................................................11

      C.   The Subpoena Accords with First Amendment Standards. ......................................13

          1.   Compliance with the Subpoena Will Not Infringe Any Right to
               Anonymity. .........................................................................................13

               a.   The Right to Anonymity Does Not Apply Here. ...............................13

               b.   Chevron's Interest in Disclosure Outweighs Any Claimed
                    Right to Anonymity. ..........................................................................15

          2.   Compliance with the Subpoena Will Not Infringe Any Right of
               Association. ........................................................................................21

IV.    CONCLUSION ...................................................................................................23

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*AF Holdings LLC v. Doe*,
　No. 12-cv-02416-WHA, 2012 U.S. Dist. LEXIS 75806 (N.D. Cal. May 31,
　2012) ................................................................................................................... 8

*Arista Records LLC v. Does 1-16*,
　Civ. No. 1:08-CV-765 (GS/RFT), 2009 WL 414060 (N.D.N.Y. Feb. 18, 2009) ................... 16

*Arista Records v. Doe 3*,
　604 F.3d 110 (2d Cir. 2010) ................................................................................ 16

*Boyle v. United States*,
　556 U.S. 938 (2009) ........................................................................................... 11

*Branzburg v. Hayes*,
　408 U.S. 665 (1972) ........................................................................................... 14

*Chevron Corp. v. Champ*,
　Nos. 1:10-mc 27, 1:10-mc 28, 2010 WL 3418394 (W.D.N.C. Aug. 30, 2010) ................... 17

*Chevron Corp. v. Donziger*,
　768 F. Supp. 2d 581 (S.D.N.Y. Mar. 7, 2011) ...................................................... 17

*Chevron Corp. v. Donziger*,
　871 F. Supp. 2d 229 (S.D.N.Y. May 14, 2012) ............................................... 15, 17

*Chevron Corp. v. Naranjo*,
　667 F.3d 232 (2d Cir. 2012) ................................................................................ 17

*Chevron Corp. v. Page*,
　No. RWT-11-1942 (D. Md. Aug. 31, 2011) .......................................................... 17

*Chevron Corp. v. Salazar*,
　No. 11 Civ. 3718 (LAK), 2011 WL 2207555 (S.D.N.Y. June 2, 2011) ...................... 8, 9

*Columbia Ins. Co. v. Seescandy.com*,
　185 F.R.D. 573 (N.D. Cal. 1999) ........................................................................ 13

*Doe I v. Individuals*,
　561 F. Supp. 2d 249 (D. Conn. 2008) ................................................................. 19

*Doe v. 2TheMart.com*,
　140 F. Supp. 2d 1088 (W.D. Wash. 2001) ........................................................... 20

*Doe v. SEC*,
　No. 11-mc-80184 CRB (NJV), 2011 WL 4593181 (N.D. Cal. Oct. 4, 2011) ................... 9, 19

*Griffin v. Maryland*,
　19 A.3d 415 (Md. 2011) ...................................................................................... 11

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
　538 U.S. 600 (2003) ........................................................................................... 14

*In re Anonymous Online Speakers*,
   661 F.3d 1168 (9th Cir. 2011) ................................................................... 15

*In re Chevron Corp.*,
   633 F.3d 153 (3d Cir. 2011)...................................................................... 17

*In re Chevron Corp.*,
   No. 10 MC 00002 (LAK) (S.D.N.Y. Dec. 27, 2010)................................. 3

*In re Chevron Corp.*,
   No. 10-cv-1146-IEG(WMC), 2010 WL 3584520 (S.D. Cal. Sept. 10, 2010)........................ 17

*In re Chevron Corp.*,
   Nos. 1:10-mc-00021-JCH-LFG (D.N.M. Sept. 2, 2010) ................................ 3

*In re Grand Jury Proceedings*,
   776 F.2d 1099 (2d Cir. 1985)...................................................................... 22

*In re Jean-Baptiste*,
   No. M 11-188, 1985 WL 1863 (S.D.N.Y. July 5, 1985) ...................................... 15

*In re Roebers*,
   No. 12-mc-80145-RS (LB) 2012 WL 2862122 (N.D. Cal. July 11, 2012) ...................... 8

*In re United States*,
   830 F. Supp. 2d 114 (E.D. Va. 2011) ........................................................ 20

*John Wiley & Sons, Inc. v. Does 1-35*,
   12 Civ. 2968 (RWS), 2012 U.S. Dist. LEXIS 182741 (S.D.N.Y. Dec. 28, 2012) ............ 8, 16

*Langford v. Chrysler Motors Corp.*,
   513 F.2d 1121 (2d Cir. 1975)...................................................................... 7

*Libaire v. Kaplan*,
   760 F. Supp. 2d 288 (E.D.N.Y. 2011) ...................................................... 13

*London v. Does 1-4*,
   279 F. App'x 513 (9th Cir. 2008) .............................................................. 8

*Malmberg v. United States*,
   No. 5:06-cv-1042 (FJS/GHL), 2010 WL 1186573 (N.D.N.Y. Mar. 24, 2010)..................... 8

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995)........................................................................... 13, 14

*McMann v. SEC*,
   87 F.2d 377 (2d Cir. 1937)....................................................................... 12

*N.Y. State Nat'l Organization for Women v. Terry*,
   886 F.2d 1339 (2d Cir. 1989)................................................................ 21, 22

*Next Phase Distrib., Inc. v. Does 1-138*,
   No. 11 Civ. 9706 (KBF), 2012 WL 691830 (S.D.N.Y. Mar. 1, 2012) ...................... 16

*Nova Prods., Inc. v. Kisma Video, Inc.*,
   220 F.R.D. 238 (S.D.N.Y. 2004) ............................................................ 7, 12

*People v. Clevenstine*,
   891 N.Y.S.2d 511 (N.Y. App. Div. 2009) ................................................. 11

*Schoolcraft v. City of New York*,
    No. 10 Civ. 6005 RWS, 2012 WL 2161596 (S.D.N.Y. June 14, 2012) ................................ 13

*Snider v. Lugli*,
    CV 10-4026 JFB AKT, 2011 WL 5401860 (E.D.N.Y. Nov. 4, 2011) .................................. 13

*Sony Music Entm't Inc. v. Does 1-40*,
    326 F. Supp. 2d 556 (S.D.N.Y. 2004)........................................................................ 15, 16, 19

*United States ex rel. Sasaki v. N.Y. Univ. Med. Ctr.*,
    No. 05 Civ. 6163, 2011 U.S. Dist. LEXIS 95059 (S.D.N.Y. Aug. 23, 2011) ...................... 12

*United States v. IBM*,
    83 F.R.D. 99 (S.D.N.Y. 1979) ............................................................................................ 12

*United States v. Konstantakakos*,
    121 F. App'x 902 (2d Cir. 2005) ........................................................................................ 14

*United States v. Sattar*,
    395 F. Supp. 2d 79 (S.D.N.Y. 2005)................................................................................... 15

*Xcentric Ventures, LLC v. Karsen, Ltd.*,
    No. 11-cv-01055-PHX-FJM, 2012 U.S. Dist. LEXIS 121888 (D. Ariz. Aug. 28,
    2012) .................................................................................................................................... 9

**Rules**

Fed. R. Civ. P. 26 ..................................................................................................................... 2

Fed. R. Civ. P. 26(b) .............................................................................................................. 10

Fed. R. Civ. P. 26(b)(1)........................................................................................................... 10

Fed. R. Civ. P. 45 .................................................................................................................... 10

Fed. R. Evid. 803(6) ............................................................................................................... 11

Fed. R. Evid. 901(a) ............................................................................................................... 19

**Treatises**

9A Charles Alan Wright, Arthur R. Miller, et al.,
    Federal Practice and Procedure § 2035.......................................................................... 7, 13

# I.     INTRODUCTION

The subpoena the movants seek to quash requests basic identifying and login information for several email accounts.  Courts routinely allow production of such information—particularly where, as here, that information directly supports a legal claim.  Because Chevron's underlying claims and factual allegations have withstood a motion to dismiss and have already been evaluated by the Court in the context of summary judgment—and because each account at issue was used in furtherance of the fraud giving rise to those claims—the motion to quash should be denied.

The context of this motion is Chevron's claim that a group of U.S. plaintiffs' lawyers obtained a $19 billion judgment against Chevron in Ecuador through pervasive fraud involving the illicit sharing of draft documents and other ex parte communications (the "Ecuador litigation").  Courts throughout the United States have, in applying the crime-fraud exception to authorize discovery by Chevron, concluded that the evidence demonstrates that the plaintiffs' lawyers' efforts to prosecute that case likely have been tainted by fraud.

The subpoena now at issue was served on Microsoft Corporation on September 19, 2012, in connection with Chevron's suit under the Racketeer Influenced and Corrupt Organizations Act and New York law (the "RICO action"), in order to obtain information relevant to the core claims that Chevron has asserted.  Each of the individual email account owners who bring this motion was intimately involved with the fraud alleged in that action.  These purportedly anonymous "John Does" managed legal and public relations strategies that furthered that fraud, helped the plaintiffs' attorneys tout a fraudulent "independent" expert report in the Ecuadorian court, and arranged meetings with key Ecuadorian political figures that helped fix the judgment against Chevron.

As an initial matter, under settled law the Does lack standing to quash the request for information as to accounts that they do not own. Here, the owners of the majority of the email accounts have not objected to the disclosure of information by Microsoft, making the Does' attempt to quash the subpoena in its entirety particularly inappropriate.

And even as to the email accounts that the Does claim to own, the subpoenaed information will provide evidence about the structure and management of the RICO defendants' fraudulent enterprise, will confirm that many of the defendants' fraudulent acts occurred in the United States (thus rebutting the defendants' jurisdictional and extraterritoriality arguments), and is reasonably calculated to establish how major acts of fraud (such as the creation of the fraudulent expert report and the ghostwriting of the Ecuadorian court judgment itself) were perpetrated. Because those facts are relevant to claims in the RICO action and are overcome by no privilege, Chevron is entitled to the subpoenaed information. Fed. R. Civ. P. 26.

The Does, moreover, are incorrect that compliance with the subpoena would violate their First Amendment rights to anonymous speech or association. The subpoena seeks specific, narrow information that courts routinely direct email providers to disclose. Moreover, the Does are not anonymous in any meaningful sense. They have freely disclosed their connection to the email accounts at issue, and the First Amendment does not protect the Does' efforts to support a fraudulent scheme.

At bottom, this motion is nothing more than the latest effort to delay and impede Chevron's legitimate discovery and keep hidden details of the fraud perpetrated by the RICO defendants. The arguments asserted here are no more substantive than the similar "First Amendment" arguments that the defendants and their allies asserted to try to prevent Chevron from obtaining outtakes of the documentary Crude. But in that instance, once the Court pierced

the flawed claims that the requests were overbroad and invasive, the outtakes "sent shockwaves through the nation's legal communities, primarily because the footage shows, with unflattering frankness, inappropriate, unethical and perhaps illegal conduct." *In re Chevron Corp.*, No. 1:10-mc-00021-JCH-LFG, slip op. 3-4 (D.N.M. Sept. 2, 2010), Dkt. 77. Chevron respectfully requests that the Court similarly deny this effort to prevent relevant discovery.

## II.    BACKGROUND

The presiding Judge is well aware of the background of the Ecuador litigation and RICO action. As the Court knows, to support its claims in the RICO action, Chevron has pursued discovery to uncover evidence of the fraud committed by the plaintiffs' attorneys in the Ecuador litigation (collectively with their clients, the "LAPs"). The LAPs have continually obstructed that effort. *See, e.g.*, Order at 1-2, *In re Chevron Corp.*, No. 10 MC 00002 (LAK) (S.D.N.Y. Dec. 27, 2010), Dkt. 151 (describing special master's report that Donziger was continually "unresponsive" in his deposition and that his answers were "self[-]serving"—and that they remained so despite repeated instructions and orders striking Donziger's answers); Order at 2, *In re Chevron Corp.*, No. 10 MC 00002 (LAK) (S.D.N.Y. signed Jan. 21, 2011), Dkt. 171 (noting Donziger's failure to produce information about an email account containing "documents of obvious possible relevance"); RICO Dkt. 31-21 at 145:8-10[1] (testimony by one of the LAPs' experts that Donziger affirmatively interceded to try to convince him not to testify in the RICO action); Ex. 1 at 1[2]

---

[1]  Unless otherwise specified, citations herein to "Dkt." refer to the docket for case number 1:12-MC-65 GLS/CFH (N.D.N.Y.). Citations herein to "RICO Dkt." refer to the docket for case number 11 Civ. 691 (LAK) (S.D.N.Y.).

[2]  Unless otherwise specified, "Ex." refers to exhibits to the Declaration of Alexander Marx, filed concurrently herewith.

(Donziger describing discovery strategy thus:  to "fight hard on all fronts all the time and concede nothing, buy as much time as possible").

Because the LAPs have consistently obstructed discovery, Chevron has been forced to painstakingly uncover information that the LAPs have concealed.  The subpoena at issue here is part of those efforts, and seeks information about email accounts identified principally through the review of documents recovered from an image of Donziger's hard drive.  Ex. 2.  Specifically, the subpoena seeks information about the users of several email accounts, as well as IP logs and IP address information.  *See id*. (Subpoena at 2).  Discovery of such information is critical because the LAPs used email accounts to share documents to further their fraudulent scheme.  For example, to plan for the secret ghostwriting of the purportedly independent expert's report, Donziger and his primary Ecuadorian counterpart, Pablo Fajardo, set up an email account on which they loaded information that each could access.  To hide the fraudulent nature of that information, Fajardo told Donziger "not [to] insert any names in the document," but instead to use the code names "Lagarto 2" and "Lagarto 3."  RICO Dkt. 402-13 (Champion Decl. Ex. 2315); RICO Dkt. 398 ¶ 141.

The Does responsible for the pending motion claim to own only three of the 30 email accounts listed in the subpoena:  simeontegel@hotmail.com, mey_1802@hotmail.com, and lupitadeheredia@hotmail.com.  *See* Memorandum Supporting Motion to Quash ("Mem.") at 3; Dkt. 2-2 ¶ 3.  The Does do not claim that they are authorized to represent any other account holders listed in the subpoena.  *See* Mem. 3.

Chevron believes that the owners of these accounts are, respectively, Simeon Tegel, Maria Eugenia Yepez, and Lupita de Heredia.  Chevron seeks information about these accounts because—although Chevron has not named these Does as defendants—the evidence Chevron has

obtained shows that these accounts were used to help the LAPs further their fraudulent enterprise, and that each Doe has been intimately involved in the LAPs' fraudulent enterprise.

Simeontegel@hotmail.com is apparently an email account of Simeon Tegel, who was from 2005 to 2008 the Communications Director of Amazon Watch, an entity funded and directed by Steven Donziger to facilitate the LAPs' fraudulent scheme.  *See* RICO Dkt. 283 ¶ 18(f) (naming Amazon Watch a non-party co-conspirator in the RICO action and describing how it contributed to the RICO defendants' fraudulent scheme).  Tegel publicized and distributed the fraudulent Cabrera report and helped Donziger further the LAPs' fraud by writing false letters to news entities.  Those letters trumpeted the LAPs' baseless claim that TexPet's "remediation . . . [w]as a sham as confirmed by laboratory samples provided by a court-appointed expert and by Chevron itself," Ex. 3, and praised Cabrera's qualifications and independence, Ex. 4.  These and other activities were all part of a public relations campaign to legitimate a fraudulent judgment against Chevron.  *See, e.g.*, Ex. 5.

Mey_1802@hotmail.com is apparently an email account of Maria Eugenia Yepez.  Yepez worked as a strategist and liaison for Donziger and the LAPs.  She set up meetings between the LAPs' attorneys and Ecuadorian political figures, including the President of the Supreme Court, Ex. 6; Ex. 7, and officials of the Ministry of Health, Ex. 8.  Those meetings helped fix the judgment for the LAPs.

Lupitadeheredia@hotmail.com is apparently an email account of Lupita de Heredia.  Heredia worked closely with Donziger on press releases, media contacts, and media appearances that furthered the scheme against Chevron.  She was so enmeshed in the LAPs' activities that she gave assignments to the LAPs' interns.  Ex. 9.

The remaining email accounts listed in the subpoena were also apparently created by people who were as or more involved in the RICO defendants' fraud.  Those accounts generally fall into four categories:

- Accounts Used by the LAPs' Legal Team Personnel.  These include muerteenlaselva@hotmail.com; julprieto@hotmail.com; juanpasaenz@hotmail.com; alex_anchundia2007@hotmail.com; gabrielitaep@hotmail.com; duruti@hotmail.com; Monica_pareja@hotmail.com; renatog85@hotmail.com; and criscadena@hotmail.com.

- Accounts Used by FDA Selva Viva Personnel.  These include gaer69chzpr@hotmail.com; donaldmoncayo@hotmail.com; erikatorres_19@hotmail.com; hannagoanna@hotmail.com; maryeji20@hotmail.com; pirancha@hotmail.com; nick_aussie@hotmail.com; selvaviva2004@hotmail.com; and hjploro@hotmail.com.

- Accounts Used by Cabrera and his Associates.  These include ingracabrerav@hotmail.com; rcabrerav@hotmail.com; cristobalvillao@hotmail.com; and aulestiajuan@hotmail.com.

- Accounts Used by Ecuador Officials who had Dealings with the LAPs.  These include patriciogarcia_2009@hotmail.com; albertoguerrab@hotmail.com;  and osimonc@hotmail.com.

The remaining two addresses are an address set up by Pablo Fajardo to facilitate the fraudulent ghostwriting of the Cabrera report (examen_pericial@hotmail.com) and an address that was apparently used by Dr. Luis Alberto Villacreces Carvajal, a technical expert employed by the LAPs (luisvillacreces@hotmail.com).[3]

Importantly, each of these accounts appears to have been owned by an employee or agent of the RICO defendants or their co-conspirators, or has been identified as being directly involved in the fraud.

---

[3]  The account faisal_baki@hotmail.com has been dropped from Chevron's subpoena, and thus is not included here.  Declaration of Rebecca Gray ("Gray Decl.") ¶ 20, Ex. K.

For each account, Chevron seeks to confirm identifying information about the user, and to obtain IP log and address information.  Ex. 2 (Subpoena at 2).  Donziger himself served similar subpoenas on email provider Yahoo!—seeking *his own* user and IP information—in discovery proceedings in the RICO action.  *See* Ex. 10.  The subpoena seeks information generated since the Ecuador litigation was filed in 2003.  Ex. 2 (Subpoena at 2).  That information will support Chevron's RICO claims.  *See* Part III.B.2., *infra*.

In each of its meet-and-confer sessions with subpoenaed individuals or their counsel, Chevron has offered to limit this timeframe further, to the period that each individual worked with the LAPs.  *E.g.*, Gray Decl. Ex. E & ¶ 16.  The Does, however, have been largely unwilling to disclose the precise date ranges that they worked with the LAPs, through meet-and-confer sessions or in their motion papers:  Indeed, two of the moving Does have not even provided declarations to this Court.  The Does have provided a single declaration representing that "John Doe" worked with the LAPs during one time period, but not stating with the particularity the duration of that work or confirming whether he worked with the LAPs at other times.  Dkt. 2-4 (Declaration of "John Doe" (Simeon Tegel)).

### III.    ARGUMENT

**A.    The Does Lack Standing to Challenge the Subpoena as a Whole and May Challenge Its Application Only to the Accounts that They Own.**

A litigant lacks standing to challenge a subpoena issued to a third party, unless the litigant possesses a personal right or privilege regarding the documents sought.  *Langford v. Chrysler Motors Corp.,* 513 F.2d 1121, 1126 (2d Cir. 1975).  Nor may a litigant challenge a subpoena based on the alleged rights of others when those others do not challenge the subpoena.  *See Nova Prods., Inc. v. Kisma Video, Inc.*, 220 F.R.D. 238, 241 (S.D.N.Y. 2004); 9A Charles Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2035 (note 8 and accompanying text).

The Does claim to own only three of the 30 email accounts identified in the subpoena to Microsoft.  *See* Mem. 3; Dkt. 2-2 ¶ 3.  The Does do not identify any right or privilege that they may have as to the remaining accounts.  And the other account holders have chosen not to object to Chevron's requests or have resolved their concerns about the subpoena with Chevron.  The Does therefore lack standing to challenge the subpoena's application to the accounts that they do not own, and their motion to quash must be limited to the three accounts that they do own.  *See, e.g.*, *Malmberg v. United States*, No. 5:06-cv-1042 (FJS/GHL), 2010 WL 1186573, at *1 (N.D.N.Y. Mar. 24, 2010); *Chevron Corp. v. Salazar*, No. 11 Civ. 3718 (LAK), 2011 WL 2207555, at *2 n.11 (S.D.N.Y. June 2, 2011).  In the cases the Does rely upon, in contrast, the party opposing the subpoena suffered injury in fact or was itself subpoenaed.  The Does' request to quash the subpoena in its entirety (*see, e.g.*, Mem. 19-20) must be denied, and their request must be confined to accounts they own.

**B.    The Subpoena Makes Reasonable Requests that Courts Routinely Grant.**

**1.    Courts Routinely Require Production of the Information that Chevron Seeks.**

For each of the Does' accounts, Chevron seeks only two categories of information: (1) user identification information, and (2) usage information such as IP logs and IP address information.  *See* Ex. 2 (Subpoena at 2).  Such information is routinely sought from email service providers in civil discovery.  *See, e.g.*, *In re Roebers*, No. 12-mc-80145-RS (LB) 2012 WL 2862122, at *3 (N.D. Cal. July 11, 2012) ("Internet service providers and operators of communications systems are generally familiar with this type of discovery request.").  And courts consistently uphold subpoenas seeking such information.  *See, e.g.*, *London v. Does 1-4*, 279 F. App'x 513, 514-15 (9th Cir. 2008) (affirming denial of motion to quash subpoena on Yahoo! seeking documents disclosing IP address from which email accounts were created); *John Wiley &*

*Sons, Inc. v. Does 1-35*, 12 Civ. 2968 (RWS), 2012 U.S. Dist. LEXIS 182741 (S.D.N.Y. Dec. 28, 2012) (denying motion to quash subpoena served on defendant's internet service provider); *AF Holdings LLC v. Doe*, No. 12-cv-02416-WHA, 2012 U.S. Dist. LEXIS 75806, at *2-3 (N.D. Cal. May 31, 2012) (granting early discovery of IP log, for purpose of determining identity of allegedly infringing IP address holder); *Xcentric Ventures, LLC v. Karsen, Ltd.*, No. 11-cv-01055-PHX-FJM, 2012 U.S. Dist. LEXIS 121888, at *1-3 (D. Ariz. Aug. 28, 2012) (denying motion to quash subpoena seeking discovery of IP address information from Google).  Critically, the subpoena does not seek the contents of email communications.  *See Doe v. SEC*, No. 11-mc-80184 CRB (NJV), 2011 WL 4593181, at *4 (N.D. Cal. Oct. 4, 2011) ("addressing information" is less protected than the content of communications).

Chevron is entitled to the subpoenaed information even though the account owners listed in the Microsoft subpoena are non-parties.  Each of those account owners was an employee of the LAPs, is an attorney of a RICO defendant, is a co-conspirator, or was otherwise an agent of the LAPs.  Each account owner is therefore similarly situated to the defendants in cases in which a court has upheld a subpoena seeking identifying information and IP login information from the defendants themselves.  *Cf. Chevron Corp. v. Salazar*, No. 11 CV 03718 (LAK) (JCF), Dkt. 180 at 25 (S.D.N.Y. Aug. 3, 2011) ("Courts have repeatedly found that employers have control over their employees" and can be required to produce documents in their employees' possession.); *Chevron Corp. v. Salazar*, No. 11 CV 03718 (LAK) (JCF), Dkt. 101 at 3 (S.D.N.Y. Aug. 3, 2011) ("[L]awyers are agents for their clients.").  The law requiring defendants to comply with a subpoena therefore applies fully to the non-party account owners listed in the subpoena here.

2.      **The Subpoenaed Information Will Materially Support Chevron's Claims in the RICO Action.**

The information that Chevron seeks, moreover, is well within the bounds of information that it is entitled to pursue in the RICO action.  The Federal Rules provide that a party is entitled to discover information "that is relevant to [its] claim[s]" and "reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).[4]  Information concerning the Does' accounts is directly and materially relevant to Chevron's claims.

As summarized above, each Doe was involved in the LAPs' scheme against Chevron.[5] The subpoenaed information about the Does' accounts will directly and materially support Chevron's RICO action claims in several ways.

First, the subpoenaed information will show whether certain account holders had access to the RICO defendants' internal documents and data.  The RICO defendants and their affiliates established email accounts to store and exchange documents in furtherance of the fraud.  RICO Dkt. 402-13 (Champion Decl. Ex. 2315); RICO Dkt. 398 ¶ 141.  Such accounts were used to plan the ghostwritten "independent" expert report.  *Id.*  Whoever wrote the $19 billion judgment, moreover, had access to the RICO defendants' unfiled documents.  Information about who had such access—and when they may have accessed those documents—will provide information

---

[4]  *See also* Fed. R. Civ. P. 45, 1946 advisory committee's note (a subpoena has "the same scope as provided in Rule 26(b)"); 1970 advisory committee's note ("[T]he scope of discovery through a subpoena is the same as that applicable to . . . the other discovery rules.").

[5]  The Does' Memorandum does not once directly describe their connection to the RICO defendants.  The Does instead draw attention elsewhere—for example, with a straw man argument related to an email account *that is not before the Court* (the account of Jon Heller). *See* Mem. 4, 13, 18.  But it is undisputed that Chevron withdrew its request regarding that account shortly after Mr. Heller reached out to Chevron about it.  *See* Gray Decl. ¶ 19.  The Does' unwillingness to acknowledge the true nature of their association with the LAPs stems, no doubt, from the fact that each of the Does was intimately involved in the conduct at issue in the RICO action.

about how those documents came to be filed as the work of the "independent" court expert and how some of that information was found verbatim in the $19 billion judgment itself. *See* Ex. 2; RICO Dkt. 550 at 27-30.

Second, IP information will prove that substantial portions of the RICO predicate acts originated in the United States. That is critical because—although the RICO defendants' scheme was designed by U.S. lawyers, carried out largely in the United States, and directed at a U.S. victim—the RICO defendants have contended that Chevron's complaint seeks an extraterritorial application of RICO. RICO Dkt. 243 at 2-5.

Third, identifying information about the owners of the accounts—which were used to further the various RICO predicate acts of extortion, wire fraud, and money laundering—will provide evidence regarding the structure and management of the RICO enterprise. That evidence is essential to a RICO claim. *See Boyle v. United States*, 556 U.S. 938, 951 (2009).

Fourth, although Chevron likely knows the Does' identities, Chevron remains entitled to regularly collected business records to substantiate those identities at trial. *See, e.g.*, Fed. R. Evid. 803(6); *see also, e.g.*, *Griffin v. Maryland*, 19 A.3d 415, 421 (Md. 2011) (describing need for guarantees of authenticity before admitting internet evidence); *People v. Clevenstine*, 891 N.Y.S.2d 511, 514 (N.Y. App. Div. 2009) (same). Chevron is entitled to evidence that will show the jury who the relevant account users are. The subpoenaed documents will provide Chevron with the needed evidence.

### 3. The Subpoena Is Not Overbroad.

The Does contend that the subpoena is overbroad because it seeks information about 30 email accounts over the course of nine years and because much of the information sought is irrelevant to Chevron's claims. Mem. 20. Elsewhere, the Does add complaints about two subpoenas that were served on email providers who were not subject to the subpoena before this

11

Court.  Mem. 12, 18.  The Does even complain about a non-Doe account holder who Chevron has

removed from its subpoena.  *See* Mem. 4, 13, 18; Gray Decl. ¶ 19 & Ex. J.  But, as already

explained, the Does possess standing to challenge the subpoena only as to the three accounts that

they own.  *See* Part III.A., *supra*. As a result, their arguments as to other email account owners are

not properly before this Court.

The overbreadth cases cited by the Does (*see* Mem. at 19) do not allow them to depart

from well-settled principles of standing.  Indeed, in each of those cases the party claiming

overbreadth possessed standing to make that challenge.  *See McMann v. SEC*, 87 F.2d 377, 378

(2d Cir. 1937) (injunction against disclosure of stock account records sought by account holder);

*United States v. IBM*, 83 F.R.D. 99 (S.D.N.Y. 1979) (motion to quash brought by the subpoenaed

party); *United States ex rel. Sasaki v. N.Y. Univ. Med. Ctr.*, No. 05 Civ. 6163, 2011 U.S. Dist.

LEXIS 95059, at *4-5 (S.D.N.Y. Aug. 23, 2011) (motion to compel opposed by subpoenaed

litigant).  The Does cite no case in which a recipient of a subpoena was allowed standing to

challenge the subpoena as to another party.  Each of those cases accords with the settled rule that

a litigant may not challenge a subpoena based on the alleged rights of others.  *See, e.g.*, *Nova

Prods.*, 220 F.R.D. at 241.

Nor is there any force to the argument that the subpoena is overbroad as applied to the

Does.  The subpoena only seeks information that remains in Microsoft's custody or control since

the Ecuador litigation began in 2003.  Ex. 2 (Subpoena at 2).  Chevron has also made clear that it

is willing to narrow its requests to ensure that the subpoena yields only relevant information.

*E.g.*, Gray Decl. Exs. C, D, E, L.  Chevron has agreed, for example, to tailor the time ranges for

its request to ensure that the information produced covers only the time periods during which the

Does associated with the LAPs.  *Id.*  The Does, however, have not provided sworn evidence regarding the appropriate time periods.

"[T]he party seeking to quash [a] subpoena bears the burden of demonstrating that the subpoena is overbroad, duplicative, or unduly burdensome."  *Schoolcraft v. City of New York*, No. 10 Civ. 6005 RWS, 2012 WL 2161596, at *2 (S.D.N.Y. June 14, 2012), *reconsideration denied*, 2012 WL 2958176 (S.D.N.Y. July 20, 2012); *see also Libaire v. Kaplan*, 760 F. Supp. 2d 288, 291 (E.D.N.Y. 2011) (same); *Snider v. Lugli*, CV 10-4026 JFB AKT, 2011 WL 5401860 (E.D.N.Y. Nov. 4, 2011) (same); 9A Charles Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2459 (3d ed.) (note 7.1 accompanying text).  Here, however, the Does have failed to provide unequivocal sworn testimony supporting their assertion that certain time periods are *ir*relevant with regard to their email addresses, and have refused Chevron's offer through meet and confer to limit the time period of the subpoena.  *See* Gray Decl. Ex. M.  As a result, they fail to meet their burden to establish that the subpoena is overbroad.  *See Schoolcraft*, 2012 WL 2161596, at *2, *13.

## C.  The Subpoena Accords with First Amendment Standards.

The Does next contend that the subpoena violates their First Amendment rights to anonymity and to association.  Mem. 7-19.  This argument also has no merit.

### 1.  Compliance with the Subpoena Will Not Infringe Any Right to Anonymity.

#### a.  The Right to Anonymity Does Not Apply Here.

The First Amendment protects anonymity when it will provide "a shield from the tyranny of the majority," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995), or will "foster open communication and robust debate" by eliminating the burdens of others "knowing all the facts about one's identity," *Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573, 578 (N.D. Cal. 1999).  Those rationales for protecting anonymity disappear where, as here, a speaker has

exposed—indeed, publicized—his identity or his identity is otherwise publicly known.  In those circumstances, the speaker simply has not made the protected "decision to remain anonymous." *McIntyre*, 514 U.S. at 342.

In this case, accordingly, the Microsoft subpoena does not affect the Does' right to anonymous speech because Tegel, Yepez, and Heredia—the Does—are not anonymous.  That is of their own doing:  Tegel, Heredia, and Yepez used their names or initials when creating the addresses associated with their email accounts.  And they have long publicized their use of these particular email addresses and their association with the LAPs.  Tegel signed emails and wrote letters to news outlets using his name.  Exs. 3, 5.  Indeed, a Google search of "Simeon Tegel" returns, as its second result, Tegel's personal website, which prominently lists his Hotmail address.  Ex. 12.  Heredia gave assignments to the LAPs' interns.  Ex. 9.  And Yepez participated in radio interviews about her involvement in the LAPs' public relations efforts.  Ex. 13.  Through their very public activities, the Does have affirmatively chosen *not* "to remain anonymous." *McIntyre*, 514 U.S. at 342.  The long-public nature of their activities, moreover, belies any claim that the Does need protection from a "danger" of having their association with the LAPs "exposed."  Because the Does advertised their identities and involvement with the LAPs, there simply is no basis for their artificial claim to anonymity.

More fundamentally, although the Does cast their association with the LAPs as one of political speech or advocacy, Mem. 7, 12, 14, 15, the record is clear that they in fact provided significant assistance to the LAPs' fraudulent enterprise.  *See* Part II, *supra*.  The First Amendment does not protect fraudulent activity or associations that further a conspiracy.  *See, e.g.*, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003); *McIntyre*, 514 U.S. at 357; *Branzburg v. Hayes*, 408 U.S. 665, 697 (1972) (declining to afford First

Amendment protection to the "concealment of crime"); *United States v. Konstantakakos*, 121 F. App'x 902, 905 (2d Cir. 2005) ("[I]t has long been established that the First Amendment does not shield knowingly false statements made as part of a scheme to defraud."); *United States v. Sattar*, 395 F. Supp. 2d 79, 101 (S.D.N.Y. 2005) (the First Amendment "lends no protection to participation in a conspiracy, even if such participation is through speech"); *In re Jean-Baptiste*, No. M 11-188, 1985 WL 1863, at *1 (S.D.N.Y. July 5, 1985) (same).  The Court should reject the Does' effort to keep illicit activities concealed.

> **b.   Chevron's Interest in Disclosure Outweighs Any Claimed Right to Anonymity.**

Even if the Does had any claim to anonymity, which they do not, Chevron's interest in discovering the limited subpoenaed information would outweigh it.

When ruling on a motion to quash that seeks to preserve the movant's anonymity, a court must balance the need for disclosure against First Amendment interests.  *See Sony Music Entm't Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 564-65 (S.D.N.Y. 2004) (Chin, J.).  Because the First Amendment does not protect the Does' efforts to further fraudulent activity or to aid a conspiracy, this Court should apply "the lowest bar that courts have used" in considering whether to order disclosure of an anonymous speaker's identity:  it should consider whether "the claim for which the plaintiff seeks the disclosure" meets "the motion to dismiss or good faith standard."  *In re Anonymous Online Speakers*, 661 F.3d 1168, 1175 (9th Cir. 2011) (discussing the standards applied across circuits—including within the Second Circuit—to evaluate different First Amendment anonymity claims).  Here, the RICO defendants' motion to dismiss Chevron's claims has already been denied in relevant part (*see Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. May 14, 2012) (Westlaw version)) and the Court has found that there is no genuine dispute of material fact with respect to many of Chevron's core allegations regarding the RICO

defendants' fraud and misconduct in the Ecuador litigation (*see* RICO Dkt. 550)—conclusively showing that Chevron meets the low disclosure standard.

Even if this Court were to apply the higher "prima facie standard"—used, for example, by the Southern District of New York in *Sony Music Entm't Inc. v. Does 1-40*—Chevron would meet that standard as well.  When ruling on a motion to quash that seeks to preserve the movant's anonymity, courts in the Second Circuit weigh "the need for disclosure against First Amendment interests" by considering:  (1) the prima facie strength of the plaintiff's claims of injury; (2) the specificity of the discovery request; (3) the absence of alternative means to obtain the subpoenaed information; (4) the plaintiff's need for the information; and (5) the movant's expectation of privacy in the subpoenaed information.  326 F. Supp. 2d at 564-65; *see Arista Records v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010) (endorsing *Sony Music* test).  Applying that analysis, courts in this Circuit have denied motions to quash subpoenas that sought discovery of identifying information where the balancing of these factors overall led to the conclusion that the objecting party was not entitled to protection.  *See, e.g.*, *John Wiley & Sons, Inc. v. Does 1-35*, No: 1:12-cv-02968-RWS, 2012 U.S. Dist. LEXIS 182741 (S.D.N.Y. Dec. 28, 2012) (Sweet, J.); *Arista Records LLC v. Does 1-16*, Civ. No. 1:08-CV-765 (GTS/RFT), 2009 WL 414060, at *6 (N.D.N.Y. Feb. 18, 2009), *aff'd*, 604 F.3d 110 (2d Cir. 2010); *see also Next Phase Distrib., Inc. v. Does 1-138*, No. 11 Civ. 9706 (KBF), 2012 WL 691830 (S.D.N.Y. Mar. 1, 2012) (denying motion to quash subpoena seeking IP login information related to times and dates that the subscriber allegedly downloaded a copyrighted film).[6]

---

[6]   The *Sony Music* test rests on several considerations:  that anonymous speech does not enjoy absolute protection, *see* 326 F. Supp. 2d at 562; that such speech enjoys especially scant protection when the objecting litigant seeks to use anonymity to conceal misconduct, *see id.* at

Here, these factors both separately and collectively support disclosure.

*First*, Chevron has made a strong showing of a prima facie claim of actionable harm.  The Second Circuit has held that this factor may be satisfied by a well-pleaded complaint and a supporting exhibit and declaration.  *Arista Records LLC*, 604 F.3d at 123.  Chevron has gone well beyond that showing.  In denying the LAPs' motion to dismiss and in finding that evidence that the Ecuador litigation was "tainted by fraud" was "uncontradicted" on summary judgment, the Court has concluded that Chevron has made at least a prima facie showing of actionable harm. *See Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. 2012); RICO Dkt. 550.  Indeed, *seven* federal courts have determined that the RICO defendants committed fraud sufficient to pierce the protection against discovery of attorney-client privileged documents.[7]  Although the movants contend that Chevron must establish a prima facie case against each of them personally,

---

562-63, 565-66  and that information to support a legitimate legal claim has considerable value, *see id.* at 564-66.  Here, where there is clear evidence that the so-called "Does" assisted the Defendants' fraudulent scheme, the same governing considerations apply whether the litigant moving to quash is a party or non-party.

[7]  *See In re Chevron Corp.*, 633 F.3d 153, 166, 168 (3d Cir. 2011) (holding that Chevron had made a "prima facie showing of a fraud that satisfies the first element of the showing necessary to apply the crime-fraud exception to the attorney-client privilege" and remanding for *in camera* review); *In re Chevron Corp.*, No. 11-24599-CV, 2012 WL 3636925, at *14, *16 (S.D. Fla. June 12, 2012) (granting Chevron's motion for discovery of information "pertain[ing] to a large scale fraud upon an American corporation"); *Chevron Corp. v. Page*, No. RWT-11-1942, Oral Arg. Tr. 73:7-9, 73:25-74:10 (D. Md. Aug. 31, 2011) (applying crime-fraud exception to attorney-client privilege); *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 636 (S.D.N.Y. 2011), *rev'd on other grounds sub nom.*, *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012) ("There is ample evidence of fraud in the Ecuadorian proceedings."); *In re Chevron Corp.*, No. 10-cv-1146-IEG(WMC), 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010) (applying crime-fraud exception); *In re Chevron Corp.*, Nos. 1:10-mc-00021-22, slip op. 3-4 (D.N.M. Sept. 2, 2010) (noting evidence of the "inappropriate, unethical and perhaps illegal conduct" by LAPs' attorneys); *Chevron Corp. v. Champ*, Nos. 1:10-mc 27, 1:10-mc 28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010) (applying crime-fraud exception because "what has blatantly occurred in this matter would in fact be considered fraud by any court.").

there is no reasonable dispute that each acted as an agent or employee of the RICO defendants or their co-conspirators.

*Second*, Chevron has made a narrow and specific discovery request concerning the Does. Chevron has sought specific account usage and user documents that will "lead to identifying information" (*Sony Music*, 326 F. Supp. 2d at 566) that will assist Chevron's efforts to establish where the Does were located when RICO predicate acts took place, to learn details about the structure and management of the RICO enterprise, and to uncover further use of computers in connection with the fraudulent "independent" expert report and ghostwritten $19 billion judgment.  *See* RICO Dkt. 402-13 (Champion Decl. Ex. 2315); RICO Dkt. 398 ¶ 141; RICO Dkt. 550 at 27-30.  Chevron has not sought a broad swath of information—such as the *contents* of the Does' emails—but has instead served narrow requests that have withstood frequent judicial scrutiny.  *See* Part III.B.1., *supra*.  And the movants have not submitted any sworn evidence affirming that there is a period of time when they were *not* working with the LAPs.

*Third*, Chevron has been unable to obtain the specific information sought in the subpoenas through other means.  Chevron has pursued multiple discovery actions to obtain information about the relationships between the RICO defendants and non-parties, and the relevant interactions between the two groups.  Despite those efforts, Donziger, the LAPs, and their agents and co-conspirators have repeatedly prevented Chevron from accessing much of that evidence. *See* Part II, *supra* (summarizing some of the efforts to evade and obstruct discovery).  Given that obstruction, the subpoenas here are the best calculated means—and are, indeed, necessary—to allow Chevron to obtain the information that the LAPs have continually concealed.  At most, the Does suggest that Chevron should seek these facts from the RICO defendants themselves.  But computer users do not often record IP login information, much less the login information of the

18

computers of those who work with them.  In fact, in this very case, Donziger was forced to

subpoena Yahoo! to obtain access to the exact kind of information Chevron seeks *about his own*

*account*.  *See* Part II, *supra*.  Seeking this information from Microsoft is not only the most direct

way to proceed; it is the best way to ensure that the information has sufficient indicia of reliability

to make it admissible.  *See* Fed. R. Evid. 901(a).

     *Fourth*, the subpoenaed information is important to Chevron's claims in the RICO action.

Chevron already has obtained thousands of emails sent to and from the RICO defendants and

those associated with them, including the Does.  These emails provide evidence of fraud,

extortion, and other misconduct.  As explained above, the identities of the email account users

involved—and the location from which those users operated—will help Chevron establish where

the Does were located when RICO predicate acts took place, to learn details about the structure

and management of the RICO enterprise, and to obtain details about the fraudulent expert report

and judgment.  *See* Part III.B.2., *supra*.

     *Fifth*, the Does have only a "minimal expectation of privacy" in the subpoenaed material.

*Sony Music*, 326 F. Supp. 2d at 566.  The Does used their own names or initials in the email

addresses associated with their accounts.  And they did so using an email service (Microsoft

Hotmail) that warns users that their identifying information will not be kept private if it is

subpoenaed.  Ex. 14.  That warning—particularly when coupled with the Does' efforts to

publicize their identities and actions—renders the Does' privacy interest "minimal" at best, *Doe I*

*v. Individuals*, 561 F. Supp. 2d 249, 254 (D. Conn. 2008) (finding "minimal" expectation of

privacy based on a similar internet service provider warning), and is readily overcome by the need

for disclosure.  *See also Doe v. SEC*, No. 11-mc-80184 CRB (NJV), 2011 WL 4593181, at *4

(N.D. Cal. Oct. 4, 2011) (noting that courts "routinely reject the argument that subscribers have a

privacy interest in their account information" and rejecting motion to quash subpoena that "d[id] not seek the content of any of Movant's communications but rather 'addressing information' that will allow the SEC to identify Movant"); *In re United States*, 830 F. Supp. 2d 114, 131-33 (E.D. Va. 2011) (holding that petitioners had no expectation of locational privacy in IP logs when they voluntarily transmitted their IP addresses to Twitter).

Because all factors weigh strongly in favor of disclosure, the Does' "right to remain anonymous"—if it could even be said to apply here—must "give way to [Chevron's] right to use the judicial process to pursue" its claims. *Sony Music*, 326 F. Supp. 2d at 567.

The Does ask this Court to apply a four-part standard articulated by a judge in the Western District of Washington in *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088 (W.D. Wash. 2001). The *2TheMart.com* test looks to whether: (1) the subpoena was issued in good faith and not for an improper purpose; (2) the information sought relates to a core claim; (3) the identifying information is directly and materially relevant to that claim; and (4) information sufficient to establish that claim is unavailable from any other source. *2TheMart.com*, 140 F. Supp. 2d at 1095.[8] But application of the *2TheMart* standard does not change the result here. As noted above, in this case the subpoenaed information relates to a core claim, the subpoenaed information is directly and materially relevant to that claim, and Chevron has shown that it cannot obtain that information from another source. Chevron therefore satisfies the second, third, and fourth *2TheMart.com* factors. And, in seeking the subpoenaed information, Chevron has acted in good faith: Chevron has well-supported RICO claims, the accounts at issue were used by persons

---

[8]   The Does are wrong to contend that, to obtain disclosure, a plaintiff "must show" that it prevails on all four *2TheMart.com* factors. Mem. 13. To the contrary, the court in *2TheMart.com* described its test as an overall balancing analysis of several factors, not four elements that must all be met. *See 2TheMart.com*, 140 F. Supp. 2d at 1095-97.

who were involved in the RICO defendants' illicit enterprise, and Chevron has been willing to work with the Does to tailor its request to uncover only relevant information.  This is more than enough to support the subpoenas under *2TheMart.com*.

Indeed, the Ninth Circuit has described the *2TheMart.com* standard as "fall[ing] somewhere between the motion to dismiss and the prima facie standards" in the extent to which it favors disclosure.  *Anonymous Online Speakers*, 661 F.3d at 1176.  That description apparently rests on the fact that—unlike the prima facie standard set forth in *Sony Music*—*2TheMart.com* does not focus on whether a plaintiff has established a prima facie case, but instead merely *balances* whether the subpoena was "issued in *good faith*" (a clearly lower bar) against other factors.  Because Chevron satisfies the higher prima facie standard, it *a fortiori* satisfies the *2TheMart.com* standard.  Thus, under even the Does' inapplicable standard, the subpoenaed information must be disclosed.

### 2.      Compliance with the Subpoena Will Not Infringe Any Right of Association.

The Does also cannot avoid enforcement of the subpoena based on a claimed infringement of their freedom of association, because they cannot "ma[ke] a *prima facie* showing that disclosure would infringe" their associational rights.  *N.Y. State Nat'l Organization for Women v. Terry*, 886 F.2d 1339, 1354 (2d Cir. 1989).

To begin with—and as explained above—the Does have disclosed their identities.  The Does, moreover, have freely and publicly associated themselves and their identities with the LAPs and their lawsuit against Chevron.  The genie has left the bottle:  Nothing about *re*-disclosure of the Does' identities could hamper their associational freedom.

Indeed, if disclosure could have harmed the Does at all, that (self-inflicted) harm would have already occurred.  Yet the Does do not identify any harm that has ever hampered their associational freedom.  The Does have long publicized their association with the LAPs and were

open about their identities during that association.  *See* Part II, *supra*.  Yet the Does do not show that their open involvement with the LAPs caused them to face harassment, threats, or anything else that chilled their speech.  *See* Dkt. 2-2, *passim*.  The absence of such harm stands in stark contrast to the baseless speculation set forth in the declaration by "John Doe" Simeon Tegel. Tegel states that he "believes his use of his email account to communicate with his sources would be chilled if Chevron obtained details about his account" and that he "would be intimidated and deterred from engaging in activism or litigation against Chevron in the future" if Microsoft complies with the subpoena.  Mem. 4.  That speculation, however, is inexplicable in light of Tegel's long public association with the LAPs (he worked for the Donziger-funded, RICO defendant co-conspirator Amazon Watch from 2005 to 2008), which has apparently never caused him such harms.  *See, e.g.*, Ex. 5.  Even if Tegel had experienced such harms, of course, they would not be protected by invoking the freedom of association here:  He unmasked himself and forfeited any right to conceal his identity.

Even if the Does could make a prima facie showing of potential harm, moreover, they still cannot overcome Chevron's compelling interest in the subpoenaed material under the governing legal standards.  *See Terry*, 886 F.2d at 1355; *In re Grand Jury Proceedings*, 776 F.2d 1099, 1103 (2d Cir. 1985).  First, there is a substantial relationship between that interest and the subpoenaed information. *See* Part III.B.2, *supra* (discussing how the subpoenaed information will support Chevron's claims).  Second, Chevron cannot obtain the material other than by subpoenaing Microsoft.  *See* Part III.C.1.b., *supra* (discussing the third *Sony Music* factor).  And third, Chevron's request does not unnecessarily affect protected rights.  Chevron has made a significant showing that the LAPs committed massive fraud and that the Does worked with them to further

that fraud.  The First Amendment does not protect fraud or associations that further a conspiracy. *See* Part III.C.1.a., *supra* (collecting authorities).

Indeed, the Does seem to concede the compelling need for disclosure, acknowledging that "[t]he government may well have a compelling interest in making sure that parties to litigation receive the information they need to properly litigate their cases in the interest of the fair administration of justice."  Mem. 18.  Chevron is entitled to disclosure.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to quash should be denied.

Dated:  January 15, 2013                         Respectfully submitted,

By:   s/ Randy M. Mastro
<br>

Randy M. Mastro
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0913
Telephone:  212.351.4000
Facsimile:  212.351.4035
rmastro@gibsondunn.com

Howard S. Hogan
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone:  202.955.8500
Facsimile:  202.530.9550
hhogan@gibsondunn.com

Paul DerOhannesian II
DEROHANNESIAN &
DEROHANNESIAN
677 Broadway Suite 202
Albany, New York 12207
Telephone:  518.465.6420
Facsimile:  518.427.0614
paul@derolaw.com

*Attorneys for Chevron Corporation*

101397310.20